Robert S. CALVERT, Petitioner,

v.

H. Winston HULL et al., Respondents.

No. B–2924.

Supreme Court of Texas.

Jan. 26, 1972.

Crawford Martin, Atty. Gen., Malcolm L. Quick, Asst. Atty. Gen., Austin, Shafer, Gilliland, Davis, Bunton & McCollum, Odessa, Liddell, Sapp, Zivley & Brown, W. Robert Brown, Houston, for petitioner.

Stayton, Maloney, Black, Hearne & Babb, John W. Stayton, Austin, for respondents.

GREENHILL, Justice.

This is a suit by five individuals, H. Winston Hull et al, to enjoin the State Comptroller, Hon. Robert S. Calvert, from disbursing funds appropriated by the Legislature for The University of Texas of the Permian Basin located upon approximately 600 acres of land near Odessa, Texas, acquired as set out below. The plaintiffs further prayed for a declaration that the Board of Regents of The University of Texas (1) had not "acquired a site" as required by House Bill 157 (later to be discussed); (2) that the land had not been deeded to the Board of Regents by a "proper conveyance;" and (3) that the land had not been acquired "free and clear of debt" as required by statute.

The trial court in Travis County entered summary judgment for the Comptroller; i. e., the plaintiffs lost across the board. The Court of Civil Appeals upheld the donation and acquisition of approximately 308 acres of the land for The University and approved the expenditure of state money thereon for the appropriated purposes of The University. As to an adjoining 280 acres, the Court of Civil Appeals reversed. It held that the 280 acres, though donated to the Regents by Ector County, had not been acquired "free and clear of debt" because of the way Ector County had handled the transaction. The Comptroller was therefore enjoined from spending appropriated money for operations on the 280 acre tract. 469 S.W.2d 277. It is our opinion that the judgment of the trial court was correct. Accordingly, we reverse the judgment of the Court of Civil Appeals and affirm the judgment of the trial court.

■ The five plaintiffs, taxpayers and owners of real property in Ector County, have standing to bring the suit. Terrell v. Middleton, 187 S.W. 367, Tex.Civ.App. 1916, writ refused with concurring per curiam opinion, 108 Tex. 14, 191 S.W. 1138. That is the famous "chicken salad" case wherein private citizens were held to have standing to sue the State Comptroller, Middleton, to enjoin the expenditure of appropriated funds to pay for chicken salad and other items of "public" entertainment at the mansion by Governor Colquitt. The holding was that a district court, upon a suit by taxpayers, was authorized to enjoin the Comptroller from expenditures which were illegal or unconstitutional. The constitution then read that the governor should receive annually $4,000 "and no more." The chicken salad expenditure was held to be an unconstitutional increase in the emolument of the governor.

Although the plaintiffs have standing to bring suit, it must also be pointed out that we do not have before us a number of other parties such as the Regents of The University of Texas, the people and foundation from Houston which originally donated approximately 308 acres of the land and who sold the balance to Ector County. Nor do we have as parties Ector County or any of its officials who donated the 280 acres. There is no direct attempt to undo

any particular deed or transaction. The illegality or unconstitutionality must therefore appear on the face of the transactions. Our holding is that the selection of the site and the conveyances of land to the Board of Regents are not of such character. Some questions are raised by the plaintiffs as to the propriety of certain acts of the Commissioners Court of Ector County, but we do not regard them as being before us in this case.

The history of the litigation, the contentions of the parties, the voluminous documents introduced, the various resolutions and the applicable statutes are all set out at length in the majority and dissenting opinions of the Court of Civil Appeals. We will set out here only such matters as are essential, and we will attempt to summarize them.

The Legislature in 1969 exhibited a spirit of urgency that The University of Texas of the Permian Basin be established without delay. It called upon the Board of Regents of The University of Texas System to select promptly a site. Its Act, effective in September of 1969, provided that the Board should not delay the acquisition of land "later than the 31st day of December, 1969." [1] The Act provided that the site should consist of at least 200 acres and be in, or near, Ector County, and not more than 12 miles from Odessa College. The Board was authorized to accept grants of property and to accept and acquire land for the site which "shall be deeded by *proper conveyance free and clear of debt*, to the State." The Act concluded by saying that the Board must follow the provisions of the Act "*with respect to site* and any decision reached to the contrary shall be null and void . . .." So these are the problems: (1) selection of a site by December 31, 1969; (2) proper conveyance; and (3) free and clear of debt.

## SELECTION OF A SITE

■ The Regents decided upon the tract of approximately 600 acres which was within Ector County and within 12 miles of Odessa College. The land, however, was subject to oil and gas leases; and there were substantial gas recovery operations on the land.

The 600 acre tract had two main parts, a 308 acre tract and a 280 acre tract. The general plan of the Regents was to have the surface oil and gas pipelines and other facilities moved off the 308 acre tract and onto the 280 acres. The 308 acres would then be the "Campus Core," and the 280 adjoining acres a sort of buffer zone. The Regents rather insisted that all pipelines and other equipment be moved off of the 308 acres. This was not accomplished.

A group of people in Houston, the Tom McKnights, the Taub heirs, Houston Endowment, Inc., and others were prepared to donate the surface of the 308 acre tract and to sell to Ector County the surface of the 280 acre tract. The Regents, by resolution, determined to accept the approximately 600 acres if they came without cost and if all pipelines, et cetera, were moved off the 308 acres.

In October, the surface of the two tracts was conveyed, subject to the various mineral and some supporting surface leases, from the Houston group to Ector County. Ector County was authorized to convey the 308 acres on to the Regents. On October 29, 1969, the county did convey the 308 acres to the Regents for The University.

The County acquired the 280 acre tract by purchase from the Houston group as a park. The Commissioners Court gave notice to issue its general obligation time warrants to pay for the surface of the 280 acre tract and for roads and streets to

1. Acts 1969, Ch. 459, H.B. 157 codified as Article 2606c–4, Vernon's Texas Civil Statutes Annotated. That article was repealed in 1971 and was re-enacted as Chapter 72 of the Texas Education Code,

§ 72.06, V.T.C.A. All statutory references herein are to Vernon's Texas Civil Statutes Annotated. All emphasis herein is added.

serve the area. The time warrants were issued. They were not secured by any lien on any particular property. Specifically, they were not supported by any lien or claim on the 280 acres.

On December 12, 1969, the county conveyed (donated) the 280 acres to the Regents for The University. The deeds to both tracts were accepted by the Regents and filed for record on that same day. The resolution of the Regents *accepted the conveyance* of both tracts, but provided that "no action to *activate and operate*" The University should take place unless, among other things not here in controversy, the pipelines and other facilities were moved from the 308 acre tract.

Thus the Regents did acquire the land, a site of more than 200 acres, on December 12, 1969. The statute said the Regents must acquire it by December 31, 1969. The argument is that because of the presence of the oil and gas activity, the rights of the dominant mineral estate, and the danger of explosion or other accident, the site was not really a *suitable* one. A plausible argument is made for that position. But whether the site was a good one or a bad one is not for us to say. That matter was entrusted to the Board of Regents, and it did pick and accept the land for a site. The site picked is within the requirements set out by the Legislature. For this reason, we agree with the Court of Civil Appeals that this attack by the plaintiffs was correctly overruled.

### PROPER CONVEYANCE

The Legislature also required that the land be "deeded [to the Regents] by proper conveyance," [and] "free and clear of debt, to the State."

■ We agree with the Court of Civil Appeals that the deeds from Ector County to the Regents are "proper conveyances." There is no question that they are conveyances, and we think they were proper conveyances. The Legislature has prescribed

a "sufficient" form of conveyance in Article 1292. There is no contention that the deeds are not "sufficient" under that statute. In Dority v. Dority, 96 Tex. 215, 71 S.W. 950 (1903), this court defined a conveyance as "any writing which is necessary to convey land, and which purports to convey any estate or interest in land."

■ The plaintiffs, with skill, argue that because in their opinion the county did not act with propriety in acquiring the 280 acres by purchase as a park, issuing county time warrants to pay for a park, acquiring the land and then giving it away to The University for university purposes, the *conveyance* was not proper. We ascribe to the legislature, in calling for a "proper conveyance," one which was properly drawn (including a correct description of the property), properly executed and properly delivered. The plaintiffs do not question any of these matters. We are cited to no case giving the words "proper conveyance" any other meaning, and we have found none.

The validity, or propriety, of the actions of the Commissioners Court is not properly before us in this action in which only the plaintiff citizens and the State Comptroller are parties. We hold that the deeds from the County to the Regents were "proper conveyances."

### FREE AND CLEAR OF DEBT

The Court of Civil Appeals founded its reversal of the judgment of the trial court as to the 280 acres on the failure of the Regents to acquire the site "free and clear of debt to the State." We disagree.

Clearly there is no debt to the State in the ordinary sense of the word. The Regents did not buy the land from anyone. There was no unpaid balance. Nor did the Regents assume any debt of the county in accepting the donation from the county. As far as this record shows, the 280 acres which were conveyed by the county were not subject to any debt of the county or anyone.

The argument is that the Commissioners Court violated its duties and exceeded its powers; and since it did, a right exists in someone or in the county to cause the transaction to be undone; for the county to get back the money it invested in the "park" which was given away by the Commissioners; that therefore the 280 acres are subject to a charge or an equitable lien to undo the wrong; and therefore The University took the land subject to this "debt." The Court of Civil Appeals held that the 280 acres were thus subject to an equitable lien and hence a "debt."

The basis for the argument is that the Texas Constitution provides that Commissioners Courts are authorized only to "exercise such powers and jurisdiction over all *county business*" as is conferred by the constitution and by statutes. Section 18 of Article V, Vernon's Ann.St. There is no specific authorization to counties to operate universities in general or to acquire land for universities. The contention is that higher education is not "county business." There is authority for counties to acquire parks. So the plaintiffs contend that the County Commissioners knowingly acquired the land as a park, issued county warrants to buy a park with the intention of transferring the "park" to The University, and did give away the "park" for university purposes. The warrants were issued, and they apparently are now in innocent hands. But the citizens of the county, the argument goes, have not been fairly treated; and if a proper suit were brought, the citizens or the county ought to be able to look to the 280 acres; and hence the 280 acres are subject to this "debt."

It is unnecessary for us here to express any opinion on the above theory. The facts are that neither the county nor the county commissioners are parties to this litigation. They would certainly have a right to be heard before any judgments are passed upon them. And as stated, the time warrants issued by the county are general obligations of the county and not secured by the land in controversy.

■ We disagree with the Court of Civil Appeals that the 280 acres are subject to an equitable lien. Again we are cited to no authority to that effect by able counsel for the plaintiffs, and we have found none. The equitable lien theory is difficult to pin down. Generally speaking, a specific debt (an obligation to pay money) is necessary to support a lien; the lien is affixed to land as security for some obligation to pay money. Taylor v. Hudgins, 43 Tex. 244 (1875); Hodges v. Roberts, 74 Tex. 517, 12 S.W. 222 (1889). No specific suggestion is made as to how this equitable lien would be foreclosed.

■ As we view the matter, the strongest argument of the plaintiffs is that a suit might be brought, a recovery might be obtained, a "debt" established, and a lien affixed. The parties necessary to establish or to disprove such matters are not before us; and, again, we express no opinion as to that. We do say that when the deeds were tendered to the Regents and accepted by them, there was no debt; and that within the contemplation of the Legislature in specifying that the land be conveyed "free of debt to the State," the requirement was met.

## THE VALIDATING ACT

Under the above construction, we do not reach the argument of the Comptroller that the Legislature has clearly manifested its approval of the establishment of The University at its present site by making further and substantial appropriations for its operation and by enacting a validating act.

The 62nd Legislature in June of 1971, after the events which transpired above, enacted a statute [2] which validates time

2. Chapter 841, S.B. 838, codified as Vernon's Article 2368a–12. Section 9 of this Act says that the validating act shall not apply, or validate proceedings, in counties having a population in excess of 350,000. It is not contended that proceedings here were not validated because of the population exception.

warrants issued by Commissioners Courts. Section 5 of that Act also specifically says that, "All actions of a Commissioners Court . . . in acquiring property and the subsequent conveyance of such property by deeds of record . . . to the Board of Regents of The University of Texas . . . are hereby ratified and confirmed and in all things approved."

Then in Section 9, the Act says that it shall not apply to acts, orders, resolutions or other instruments "the validity of which is *directly* involved *as a party in litigation* at the time this Act becomes effective."

This is a strange validating act. The time warrants, the deeds, et cetera, are certainly not *parties* to any litigation. Nor are the Commissioners Court, the County, or the Regents parties. And it is contended that in any event, they are not *directly* involved. Be that as it may, we do not use the validating act as a basis of our decision herein.

The judgment of the Court of Civil Appeals is reversed, and the judgment of the trial court is affirmed.