# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-05-00064-CV

---

**Russell J. Verney, Appellant**

**v.**

**Greg Abbott, Individually and as Attorney General of the State of Texas and
Reagan E. Greer, Individually and as Executive Director of the
Texas Lottery Commission, Appellees**

---

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
## NO. GN404078, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

This is a case involving a taxpayer's challenge to the expenditure of public funds. Appellant Russell Verney sought a declaratory judgment that appellees Greg Abbott, the Attorney General of the State of Texas (Attorney General) and Reagan Greer, Executive Director of the Texas Lottery Commission (the Commission), acted outside their authority by entering into certain contracts related to payment for legal services. Verney also sought injunctive relief enjoining the payment of pending and future sums due under the contracts. The trial court granted appellees' plea to the jurisdiction. For the reasons explained below, we will affirm the court's dismissal of appellant's case for want of jurisdiction.

**BACKGROUND**

This case is presented against the backdrop of the Texas legislative process, specifically the 2003 and 2004 legislative sessions in which the Texas legislature considered proposed legislation involving video lottery terminals (VLTs) and related Indian gaming issues. Therefore, we begin with a brief recitation of gaming law and historical facts.

**Overview of Texas gambling law and legislative activity**

There are three elements of a lottery: (1) the offering of a prize, (2) the award of the prize by chance, and (3) the giving of a consideration for an opportunity to win the prize. *Wink v. Griffith Amusement Co.*, 100 S.W.2d 695, 701 (Tex. 1936). Lotteries were constitutionally prohibited in Texas from 1845 until 1991. *See* Tex. Const. art. III, § 47 (1876) ("The Legislature shall pass laws prohibiting the establishment of lotteries and gift enterprises in this State, as well as the sale of tickets in lotteries, gift enterprises or other evasions involving the lottery principle, established or existing in other States."); Tex. Const. art. XII, § 36 (1869), Tex. Const. art. VII, § 17 (1866), Tex. Const. art. VII, § 17 (1861), Tex. Const. art. VII, § 17 (1845) ("No lottery shall be authorized by this State; and the buying or selling of lottery tickets within this State is prohibited."). Furthermore, the legislature has criminalized certain types of gambling. *See* Tex. Pen. Code Ann. §§ 47.001-.10 (West 2003).

In 1991, however, section 47 of article III of the Texas Constitution was amended to provide, in relevant part:

2

(a) The Legislature shall pass laws prohibiting lotteries and gift enterprises in this State other than those authorized by Subsections (b), (d),[1] and (e) of this section.

. . . .

(e) The Legislature by general law may authorize the State to operate lotteries and may authorize the State to enter into a contract with one or more legal entities that will operate lotteries on behalf of the State.

Tex. Const. art. III, § 47.

In 1994, two state representatives asked then-Attorney General Dan Morales whether the legislature "may, by statute, and in the absence of a constitutional amendment, authorize the operation of slot machines within the State of Texas; or, in the alternative, whether it may authorize the State to operate slot machines and to contract with one or more entities that will operate the slot machines on behalf of the State." The Attorney General issued an opinion concluding that slot machines were not permitted under article III, § 47(e). In relevant part, the opinion stated:

> A "slot machine," as that term is commonly understood, is a device which awards cash or other prizes solely on the basis of chance, and is not affected by any skill, judgment, or knowledge of a particular player. As such it constitutes an unlawful lottery in contravention of article III, section 47 of the Texas Constitution. Operation of "slot machines" may not be authorized by the legislature in the absence of a constitutional amendment. Furthermore, subsection (e) of article III, section 47, does not authorize the legislature either to permit operation of slot machines by the state, or to permit the state to contract with one or more entities to operate slot machines on behalf of the state. The legislature may not legalize the operation of slot machines by private entities merely by amending the definition of 'bet' in section 47.01(l) of the Penal Code.

---

[1] Authorizing legislature to "authorize and regulate bingo games" and to "permit charitable raffles" that are conducted by assorted religious, nonprofit, and volunteer organizations." Tex. Const. art. III, § 47(b), (d).

Op. Tex. Att'y Gen. No. DM-302 (1994). In 2003, a state representative asked Attorney General Abbott whether the legislature may authorize the State to operate video lottery terminals. *See* Op. Tex. Att'y Gen. No. GA-103 (2003). Consistent with the 1994 opinion, Abbott concluded that VLTs were not permitted under section 47(e). In relevant part, he stated that

> in approving the addition of subsection (e) to article III, section 47 of the Texas Constitution, Texas voters in 1991 did not intend to authorize the state to operate, or to contract for the operation of, 'lotteries' in the broad sense that it has been construed by the courts since the adoption of the 1876 constitution. 'Lotteries' under subsection (a) means any game that contains the elements of prize, chance, and consideration. In 1991, voters approved a 'state lottery' based on the common understanding of the term at that time, as evidenced by popular dictionaries and the ballot proposition presented to Texas voters. Moreover, Attorney General Opinion DM-302 (1994), issued less than three years after the adoption of article III, section 47(e), is a contemporaneous administrative construction of that amendment which concludes that voters in 1991 approved a narrow construction of the term "lottery" that cannot be read to authorize the state to operate slot machines. On the basis of all these factors, we conclude that article III, section 47(e) of the Texas Constitution does not permit the legislature to authorize the state to operate video lottery terminals.

*Id*. The multifarious issues of what is and is not permitted by the 1991 amendment to section 47 of article III have yet to be resolved. Rather, they remain the subject of legislative debate and Attorney General opinions. *See, e.g.*, Op. Tex. Att'y Gen. No. GA-0358 (2005) (asking whether senate bill 1326, which sought to authorize creation of county gaming districts on local option basis to administer state video lottery and which was proposed but not enacted during regular session of Seventy-ninth Legislature, would have been effective in absence of constitutional amendment); *see also* Tex. S.B. 1326, 79th Leg., R.S. (2005); Tex. H.B. 1, § 8, 78th Leg., 4th C.S. (2004) (introduced version) (authorizing Lottery Commission to conduct video lottery); Tex. H.B. 2439, 78th Leg., R.S.

(2003) (relating to operation and administration of state lottery, including authorizing Lottery Commission to offer video lottery); Tex. S.B. 1244, 78th Leg., R.S. (2003) (relating to operation of video lottery machines at racetracks); Tex. H.R.J. Res. 1, 78th Leg., 4th C.S. (2004) (proposed resolution to amend article III, section 47 to authorize the state to operate VLTs at racetracks and on Indian lands); Tex. H.R.J. Res. 3, 78th Leg., 4th C.S. (2004) (proposing constitutional amendment authorizing state to operate video lotteries); Tex. S.J. Res. 3, 78th Leg., 4th C.S. (2004) (proposing constitutional amendment authorizing operation of video lottery games in this state); Op. Tex. Att'y Gen. No. GA-0278 (2004). Ultimately, no legislation regarding VLTs was passed in 2003 or 2004. Several bills were also introduced in the 2005 legislative session, but failed to pass. *See*, *e.g.*, Tex. H.B. 9, 79th Leg., R.S. (2005); Tex. H.B. 897, 79th Leg., R.S. (2005); Tex. H.B. 2038, 79th Leg., R.S. (2005); Tex. S.B. 1097, 79th Leg., R.S. (2005).

In addition to legislative activity, gambling on Indian reservations has been the subject of litigation brought and defended by the Attorney General. *See Ysleta del Sur Pueblo v. State of Texas*, 36 F.3d 1325, 1327 (5th Cir. 1994); *see also State v. Ysleta Del Sur Pueblo*, 220 F. Supp. 2d 668, 698 (W.D. Tex. 2002).

**Facts in this case**

On December 16, 2003, First Assistant Attorney General Barry McBee signed two contracts. The first contract was an "Outside Counsel Contract" between the Attorney General and Lionel Sawyer & Collins (Lionel Sawyer), a law firm located in Las Vegas, Nevada. The second contract was an "Interagency Cooperation Contract" between the Attorney General and the Commission.

5

The outside counsel contract recites that "the OAG [Office of the Attorney General] requires the assistance of outside legal counsel in carrying out its responsibilities" and provides that the purpose of the contract is "for the OAG to obtain Outside Counsel to advise and assist the OAG in the course and scope of the OAG's performance of duties, or provision of services, as described in Addendum A." Addendum A recites that Lionel Sawyer would provide services including, but not limited to,

1. Assist[ing] in legal analysis and research of gaming and Indian gaming issues, contracts, and permitted activities on Indian lands.

2. Assist[ing] in negotiation and preparation of contracts with Indian tribes and related activities.

3. Legal advice and counsel regarding gaming and Indian gaming and any related activities.

4. Litigation support services as needed regarding gaming and Indian gaming issues.

The second contract, an Interagency Cooperation contract between the Attorney General and the Commission, includes the following provision:

STATEMENT OF SERVICES TO BE PERFORMED:

A. The OAG shall provide a full range of legal services relating to legal analysis and research of gaming and Indian gaming issues, contracts, and permitted activities on Indian lands, negotiation and preparation of contracts with Indian tribes and related activities, legal advice and counsel regarding gaming and Indian gaming and any related activities, litigation support services as needed regarding gaming and Indian gaming issues to the [Commission], up to the total dollar amount specified herein.

6

B. The OAG is authorized to provide any or all of the legal services hereunder by employing subcontractors or consultants. Notwithstanding the foregoing, the Attorney General shall obtain consent from the [Commission] prior to subcontracting legal services under this contract that will be paid for by the [Commission].

C. The OAG shall consult with the [Commission] on the amount and type of services to be subcontracted under this contract. The [Commission] shall be supplied with a copy of all work product produced by OAG subcontracts under this contract.

Furthermore, the interagency contract details how the Commission will reimburse the Attorney General. The Attorney General agreed to "provide the [Commission] with detailed billing information of the actual costs of the subcontracted legal services performed under this agreement" and limited the amount of reimbursement to $100,000. The interagency contract provided that it would expire by its terms on August 31, 2005, but either party was permitted to terminate the contract upon ten days' written notice. On April 27, 2004, the interagency contract was amended to increase the reimbursement permitted under the contract to $250,000, consistent with the Attorney General's amended outside counsel contract with Lionel Sawyer.

On December 14, 2004, over three months after the outside counsel contract expired, Verney filed suit against Abbott and Greer in their individual and official capacities, as well as against Carole Keeton Strayhorn, Comptroller of Public Accounts of the State of Texas.[2] Verney sought both declaratory and injunctive relief. First, he requested a declaration that, because section 556.006 of the government code prohibits a state agency from using appropriated money to attempt

_____

[2] Verney later filed a notice of partial nonsuit, clarifying that his suit against Strayhorn was only against her in her official capacity because she remained a necessary party.

7

to influence passage or defeat of legislative measure, (1) the interagency cooperation contract and/or outside counsel contracts are "void as against the laws and/or public policy of the State of Texas or void as illegal *ultra vires* activities" of the Commission under the control of Greer and of the OAG under the control of Abbott, and (2) "that any and all expenditures/disbursements of public funds in conjunction therewith and/or arising therefrom are thereby deemed unlawful for any and all purposes." *See* Tex. Gov't Code Ann. § 556.006(a) (West 2004); Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (West 1997). Verney also requested an injunction permanently enjoining the Commission and the Attorney General "from any and all future expenditures/disbursements of public funds pursuant and/or related to" the two contracts, "specifically including any and all expenditures of public funds in the form of previously 'authorized' payments to the OAG from the Commission for $176,342.73 as 'reimbursement' for amounts expended to [Lionel Sawyer]; as well as any authorization for and/or further payments to [Lionel Sawyer] in the now pending amount of $190,831.17; or any other amounts paid from and/or requiring any expenditures/disbursements of public funds by the Defendants."[3]

Strayhorn, through her general counsel, filed an answer notifying the court that she would abide by the decision of the courts "on all issues presented" and would not disburse any state funds related to the contracts at issue until a final decision is made in the case.[4]

---

[3] Verney also sought to recover his costs and attorney's fees. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (West 1997).

[4] In a letter to this Court, Strayhorn confirmed that her position remains as stated in her original answer.

8

The Attorney General and the Commission filed pleas to the jurisdiction. Although represented by separate counsel, both asserted that Verney lacked standing under the general rules governing taxpayer lawsuits against governmental entities or the exception to the rule. *See Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555-56 (Tex. 2000). They also argued that Verney lacked standing because performance under the contracts had already been completed. *See id.* Additionally, the Commission argued that it does not collect taxes, and its funds are not received through taxes. Thus, the taxpayer standing exception does not apply to it in this case.[5] Moreover, the Attorney General contended that the Uniform Declaratory Judgments Act (UDJA) does not confer jurisdiction on the trial court, and Verney failed to assert facts that would otherwise confer jurisdiction on the trial court. *See Beacon Nat'l Ins. Co. v. Montemayor*, 86 S.W.3d 260, 266 (Tex. App.—Austin 2002, no pet.) (citing *State v. Morales*, 869 S.W.2d 941, 947 (Tex. 1991), and *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993)).

On January 10, 2005, approximately one month after Verney filed suit, the Attorney General terminated the interagency contract with the Commission. In an affidavit attached to the Attorney General's plea to the jurisdiction, McBee averred that he had exercised the option to terminate the contract and that "[n]o payments were ever made by the [Commission] to the Attorney General under this agreement and the termination notice provides that no payments are either owed or will be made in the future."[6] In a supplement to its plea, the Attorney General provided a

---

[5] Because of our disposition of this case, we need not reach this issue.

[6] The letter, signed by McBee, was attached to the affidavit, and states: "To date, no payments have been made pursuant to the contract. The OAG agrees that the Texas Lottery Commission does not owe the OAG any further payments under the Interagency Cooperation

9

responsive letter, dated January 10, from the Deputy General Counsel of the Commission in which he acknowledged the Attorney General's termination of the contract and stated that based on the Attorney General's representation that the Commission did not owe the Attorney General any further payments under the contract, the Commission considered the contract "terminated as of today."

The trial court granted appellees' pleas to the jurisdiction, denied relief not granted, and ordered the action dismissed with prejudice. This appeal followed.

## DISCUSSION

In four issues, Verney contends that the trial court erroneously concluded it lacked subject matter jurisdiction because he had standing as a taxpayer and under the UDJA to pursue his challenge to the contracts and payments under the contracts. He primarily challenges the Attorney General's and Commission's ability to defeat the court's jurisdiction by actions taken after suit was filed.

### Standard of review

A plea to the jurisdiction is a dilatory plea that seeks dismissal of a case for lack of subject matter jurisdiction. *Harris County v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004); *Bland*, 34 S.W.3d at 554. Whether a court has subject matter jurisdiction is a question of law. *Texas Dep't*

---

Contract and that no payments will be made in the future." In his brief, Verney states that he objected to the affidavit, and the record contains Verney's stated disapproval of any consideration of the affidavit by the court. However, the record does not contain any ruling on Verney's objection to the affidavit. The trial court, in refusing to issue findings of fact and conclusions of law, stated that "[i]n granting the plea, the Court found that the *material* facts relevant to the jurisdictional issue were undisputed."

*of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004); *Texas Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002). Whether a party has alleged facts that affirmatively demonstrate a trial court's subject matter jurisdiction and whether undisputed evidence of jurisdictional facts establishes a trial court's jurisdiction are questions of law reviewed de novo. *Miranda*, 133 S.W.3d at 226. However, in some cases, disputed evidence of jurisdictional facts that also implicate the merits of the case may require resolution by the finder of fact. *Id.* (citing *Gates v. Pitts*, 291 S.W. 948, 949 (Tex. Civ. App.—Amarillo 1927, no writ)).

When a plea to the jurisdiction challenges the pleadings, we determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause. *Id.* (citing *Texas Ass'n of Bus.*, 852 S.W.2d at 446). We construe the pleadings liberally in favor of the plaintiff and look to the pleader's intent. *Id.* If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency, and the plaintiff should be afforded the opportunity to amend. *Id.* at 226-27 (citing *County of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002)). If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to amend. *Id.* at 227.

If a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, as the trial court is required to do. *Id.* (citing *Bland*, 34 S.W.3d at 555). In a case in which the jurisdictional challenge implicates the merits of the plaintiff's cause of action and the plea to the jurisdiction includes evidence, the trial court reviews the relevant evidence to determine if a fact

11

issue exists. *Id*. If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder. *Id*. at 227-28. However, if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court may rule on the plea to the jurisdiction as a matter of law. *Id*. at 228.

**Taxpayer standing**

The pleas to the jurisdiction were based on Verney's alleged lack of standing to challenge the contracts and related payments. Standing is a constitutional prerequisite to maintaining suit. *Texas Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 646 (Tex. 2004) (citing *Texas Ass'n of Bus.*, 852 S.W.2d at 444. Standing is determined at the time suit is filed in the trial court. *See Texas Ass'n of Bus.*, 852 S.W.3d at 446 n.9 (citing *Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055, 1061 (5th Cir. 1991)); *see also Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 458 (5th Cir. 2005) (standing determined as of commencement of suit). Except for issues involving mootness, subsequent events do not deprive the court of subject matter jurisdiction. *See Texas Ass'n of Bus.*, 852 S.W.3d at 446 n.9.

As a general rule, unless standing is conferred by statute, a plaintiff must demonstrate that he possesses an interest in a conflict distinct from that of the general public, such that the defendant's actions have caused the plaintiff some particular injury. *Williams v. Lara*, 52 S.W.3d 171, 178-79 (Tex. 2001) (citing *Hunt v. Bass*, 664 S.W.2d 323, 324 (Tex. 1984)). Taxpayers, however, fall under a limited judicial exception to this general rule. *Williams*, 52 S.W.3d at 179-80 (citing *Bland*, 34 S.W.3d at 556)). Taxpayers in Texas generally have standing to enjoin the illegal

12

expenditure of public funds and need not demonstrate a particularized injury. *Williams*, 52 S.W.3d at 179; *Bland*, 34 S.W.3d at 556; *Calvert v. Hull*, 475 S.W.2d 907, 908 (Tex. 1972); *Osborne v. Keith*, 177 S.W.2d 198, 200 (Tex. 1944). Implicit in this rule are two requirements: (1) that the plaintiff is a taxpayer; and (2) that public funds are expended on the allegedly illegal activity. *Williams*, 52 S.W.3d at 179; *Bland*, 34 S.W.3d at 556; *Calvert*, 475 S.W.2d at 908; *Osborne*, 177 S.W.2d at 200. A taxpayer may maintain an action solely to challenge proposed illegal expenditures; he or she may not sue to recover funds previously expended or challenge expenditures that are merely "unwise or indiscreet." *Williams*, 52 S.W.3d at 180 (citing *Hoffman v. Davis*, 100 S.W.2d 94, 96 (Tex. 1937), and *Osborne*, 177 S.W.2d at 200). Underpinning these limitations is the realization that "governments cannot operate if every citizen who concludes that a public official has abused his discretion is granted the right to come into court and bring such official's public acts under judicial review." *Id.* (quoting *Osborne*, 177 S.W.2d at 200, and citing *Bland*, 34 S.W.3d at 555). As a component of subject matter jurisdiction, we review a claimant's standing de novo. *City of Sunset Valley*, 146 S.W.3d at 646; *Texas Ass'n of Bus.*, 852 S.W.2d at 445.

### *Whether Verney had taxpayer standing to challenge the outside counsel contract*

First, we consider whether Verney had standing as a taxpayer to challenge past payments and to enjoin future payments pursuant to the outside counsel contract. Similarly, we will consider his standing to challenge the expenditure of public funds in the form of state employee time related to the contracts.

The parties dispute whether *Bland* governs the analysis in this case. *See* 34 S.W.3d at 547. In *Bland*, the school district contracted for the construction of a new high school, financing

13

$1,050,000, out of the project's total cost of $1,390,000, through a lease-purchase agreement with Citicorp, Inc. *Id*. at 549. The contract provided that the district would make semiannual payments of $53,917 from 1997 through 2011. *Id*. In 1998, the Blues filed suit to enjoin future payments to Citicorp, alleging that the lease-purchase agreement was illegal because the district had failed to comply with certain statutory provisions. *Id*. The district filed a plea to the jurisdiction, asserting that the Blues lacked standing because the building had been completed and all that remained from the transaction was the repayment of the loan. *Id*. The district also argued that the Blues lacked standing as district taxpayers because only state funds were used on the project. *Id*. (Blues did not assert standing on basis of being state taxpayers). The district court sustained the district's plea in part, looking only to the agreement and not to collateral evidence. *Id*. The supreme court held that in deciding a plea to the jurisdiction, the trial court is not required to look solely to the pleadings but may consider evidence relevant to the jurisdictional issue, and must do so when it is necessary to resolve the jurisdictional issues raised. *Id*. at 555; *see Miranda*, 133 S.W.3d at 226. Further, the court concluded that the Blues lacked taxpayer standing to pursue their claim because

> the jurisprudential justification for taxpayer suits to enjoin performance of illegal agreements is that the interferences such suits pose to government activities is slight in comparison to the protection afforded taxpayers from preventing the culmination of illegal agreements made by public officials. But the balance in costs and benefits shifts significantly once the governmental entity has received all that it bargained for and must simply pay for it. . . . When all that remains is a school district's repayment of a loan for work completed, allowance of a taxpayer action to prohibit such repayment threatens a substantial interference with government actions. . . . The potential for disruption of government operations is too great to allow a taxpayer with no special injury distinct from the general public's to sue to prohibit the government from paying for goods and services it has already received and placed in permanent use.

14

*Bland*, 34 S.W.3d at 557-58.[7]

We conclude that the supreme court's analysis in *Bland* is dispositive of the taxpayer standing issues in this case. The outstanding balance owed by the Attorney General to Lionel Sawyer under the contract is like the loan repayments due in *Bland*: the Attorney General has received all that it bargained for in the outside counsel contract because Lionel Sawyer has completed the legal services contemplated under the contract—the Attorney General "must simply pay for it." *See id*. at 558.[8] Similarly, the Attorney General has performed under the interagency contract—the Commission "must simply pay for it." *See id*. Furthermore, the outside counsel contract expired pursuant to its own terms before Verney filed suit, and performance and payment

---

[7] In reaching the holding in *Bland*, the supreme court distinguished the case of *Kordus v. City of Garland*, 561 S.W.2d 260 (Tex. Civ. App.—Tyler 1978, writ ref'd n.r.e.). *See Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 557 (Tex. 2000). *Kordus* involved a taxpayer suit to recover money donated and dues paid by the City of Garland to the local chamber of commerce, and to prohibit the City from performing its agreement with the chamber to donate additional money in the future. *See* 561 S.W.2d at 260. In allowing the suit, the Court stated that it was an "important" fact that the agreement was executory—the chamber had not yet rendered any service for the payments. *Bland*, 34 S.W.3d at 557 (citing *Kordus*, 561 S.W.2d at 260). In *Bland*, however, performance was complete and nothing remained to be performed under the agreement except payment for services rendered.

[8] Verney also argues that the Attorney General and the Commission did not receive all that it "bargained for" because "they wanted legalized gambling and ended up with worthless paper" because no laws were passed as the results of Lionel Sawyer's efforts. We disagree. The Attorney General contracted for legal services that they apparently received: assistance with legal analysis, negotiation and preparation of contracts, research, legal advice, and litigation support services. In any event, the contracts are no longer in effect, and payment remains due only for Lionel Sawyer's performance under the outside counsel contract.

15

under the interagency contract is directly tied to the outside counsel contract. Thus, the record does

not support a finding that additional services have been contracted for, yet not performed.[9]

Additionally, a suit to enjoin the performance of a contract becomes moot after the

contract has been fully performed. *See Hulett v. West Lamar Rural High Sch. Dist.*, 232 S.W.2d 669,

670 (Tex. 1950); *Labrado v. County of El Paso*, 132 S.W.3d 581, 589 (Tex. App.—El Paso 2004,

no pet.). Therefore, even if Verney had standing to challenge the outside counsel contract, when it

expired on its own terms, the issuance of an injunction enjoining performance under the contract

became moot. *See id.*

Verney also argues that appellees may not rely on the terms of the contracts because

illegal contracts are void and of no effect. *See McGahey v. Ford*, 563 S.W.2d 857, 861 (Tex. Civ.

App.—Fort Worth 1969, writ ref'd n.r.e.) (citing *J. P. Wooten Motor Co. v. First Bank of Swenson*,

281 S.W. 196, 197 (Tex. Comm'n App. 1926, judgm't adopted)) (void instrument has no effect); *see*

*also Florey v. Estate of McConnell*, No. 03-04-00318-CV, 2006 Tex. App. LEXIS 4971, at *9 (Tex.

App.—Austin 2006, no pet. h.). Thus, Verney concludes that the jurisdiction of the trial court cannot

be affected by the contract's expiration. We disagree. Even if the contract was illegal and void, a

question we do not decide today, the jurisdiction of the trial court is limited to justiciable

---

[9] Verney's attempts to distinguish Bland are unavailing. Although he points to distinctions on the bases that he is challenging the actual subject-matter of the contracts, not merely the method of payment; that there is no third-party lender involved in this case; and that the threatened interferrance with government action is lower in this case—these distinctions are irrelevant to Verney's standing as a taxpayer. The essence of the holding in *Bland* is directly on point in this case: when all that remains is payment for work completed, allowance of a taxpayer action to prohibit such payment threatens a substantial interference with government actions. *See id.* at 557-58.

16

controversies. Thus, we may consider the terms of the contract in determining if the controversy is justiciable and, therefore, alive or moot. We overrule Verney's third issue.

In his fourth issue, Verney urges us to hold that, even if the trial court lacked jurisdiction to determine the legality of the contracts based on his other grounds, it had jurisdiction to reach the merits of his claims based on his allegation that the expenditure of public funds—in the form of time spent by state employees related to the underlying acts and in defending the lawsuit he filed—is also an illegal expenditure of public funds because the underlying acts were *ultra vires*. Verney contends that the supreme court's conclusion in *Williams v. Huff* supports his theory that the trial court had jurisdiction to consider his claims because a significant amount of state employee time has been spent defending this lawsuit. *See* 52 S.W.3d 171, 183 (Tex. 2001) (concluding that county funds were expended in operating a religious prison program where there was proof that county-paid employees "spent a significant amount of the County's time operating" the program). Verney's reliance on *Huff* is misplaced.

Article IV, section 22 of the Texas Constitution provides that the Attorney General "shall represent the State in all suits and pleas in the Supreme Court of the State in which the State may be a party . . . and perform such other duties as may be required by law." Tex. Const. art. IV, § 22; *see El Paso Elec. Co. v. Texas Dep't of Ins.*, 937 S.W.2d 432, 438 (Tex. 1996). The legislature has expanded the Attorney General's authority to include representing the State before the appellate courts. *El Paso Elec. Co.*, 937 S.W.2d at 438 (citing Tex. Gov't Code Ann. § 402.021 (West 2005)). The legislature, pursuant to the authority delegated to it under article IV, section 22, may empower the Attorney General to represent the State in district court. *Id*. (citing *Brady v. Brooks*, 89 S.W.

1052, 1055 (Tex. 1905)). The legislature has provided for such representation in particular types of cases, including this case. *See* Tex. Gov't Code Ann. § 467.105 (West 2004) (attorney general shall designate at least one member of attorney general's staff to counsel and advise commission and to represent commission in legal proceedings). The facts of *Huff*, 52 S.W.3d at 183, are distinguishable from this case, in which state employees are utilized within the course and scope of their statutory and constitutional powers and duties. *See* Tex. Gov't Code Ann. § 467.105. Accordingly, we hold that the Attorney General is authorized to spend employee time defending Verney's lawsuit regardless of the merits of Verney's allegations and that such an expenditure of public funds or resources does not confer jurisdiction on the trial court. We overrule Verney's fourth issue.

**Standing under the UDJA**

Also in his second issue, Verney contends that the trial court erred in finding that he lacked standing under the UDJA to challenge Abbott's and Greer's actions as *ultra vires*.

The UDJA does not extend a trial court's jurisdiction, and a litigant's request for declaratory relief does not confer jurisdiction on a court or change a suit's underlying nature. *IT-Davy*, 74 S.W.3d at 855 (citing *Morales*, 869 S.W.2d at 947); *see* Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011. Although private parties may seek declaratory relief against state officials who allegedly act without legal or statutory authority, *IT-Davy*, 74 S.W.3d at 855 (citing *Texas Educ. Agency v. Leeper*, 893 S.W.2d 432 (Tex. 1994), *W. D. Haden Co. v. Dodgen*, 308 S.W.2d 838, 838 (Tex. 1958)), a declaratory judgment will only declare the rights, duties, or status of the parties in an otherwise justiciable controversy. *Democracy Coalition v. City of Austin*, 141 S.W.3d 282, 297 (Tex. App.—Austin 2004, no pet.) (Citing *Frasier v. Yanes*, 9 S.W.3d 422, 427 (Tex. App.—Austin

18

1999, no pet.)). Although Verney's suit under the UDJA properly sought declaratory relief related to his allegation that state officials acted outside their statutory authority, we must consider whether the trial court properly granted appellees' pleas to the jurisdiction because his claims were moot. As we have already discussed, any challenge to the outside counsel contract was moot because the contract expired on its own terms before Verney filed suit. *See Hulett*, 232 S.W.2d at 670; *Labrado*, 132 S.W.3d at 589.

### *Mootness*

Dismissal for mootness is not a ruling on the merits. *Speer v. Presbyterian Children's Home & Serv. Agency*, 847 S.W.2d 227, 229 (Tex. 1993). A case becomes moot if a controversy ceases to exist between the parties at any stage of the legal proceedings, including the appeal. *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737 (Tex. 2005); *Allstate Ins. Co. v. Hallman*, 159 S.W.3d 640, 642 (Tex. 2005); *Board of Adjustment v. Wende*, 92 S.W.3d 424, 427 (Tex. 2002); *Williams v. Lara*, 52 S.W.3d 171, 184 (Tex. 2001). If a case becomes moot, the parties lose standing to maintain their claims. *Huff*, 52 S.W.3d at 184 (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983)).

A suit to enjoin the performance of a contract becomes moot after the contract has been fully performed. *See Hulett*, 232 S.W.2d at 670; *Labrado*, 132 S.W.3d at 589. When a request for injunctive relief becomes moot because the action sought to be enjoined has been accomplished, a request for declaratory relief also becomes moot. *Speer*, 847 S.W.2d at 229; *Labrado*, 132 S.W.3d at 589. In some circumstances, however, a live claim for attorney's fees will prevent a suit for injunctive and declaratory relief from becoming moot. *See Camarena v. Texas Employment*

*Comm'n*, 754 S.W.2d 149, 151 (Tex. 1988). We conclude that Verney's challenge to the interagency contract and payments thereunder became moot when the contract was terminated without any payment, *see Hulett*, 232 S.W.2d at 670, and with the express acknowledgment that no payments would be made in the future.

Verney contends that if we find that his claims are moot, they fall under the "capable of repetition, yet evading review" exception to the mootness doctrine. *Huff*, 52 S.W.3d at 184. We disagree. This exception applies only in rare circumstances. *Id*. (citing *Lyons*, 461 U.S. at 109). In order to invoke the exception, a plaintiff must prove that: (1) the challenged action was too short in duration to be litigated fully before the action ceased or expired; and (2) a reasonable expectation exists that the same complaining party will be subjected to the same action again. *Huff*, 52 S.W.3d at 184 (citing *Murphy v. Hunt*, 455 U.S. 478, 482 (1982)); *see Blum v. Lanier*, 997 S.W.2d 259, 264 (Tex. 1999); *General Land Office v. OXY U.S.A., Inc.*, 789 S.W.2d 569, 571 (Tex. 1990). We conclude that Verney's claims are not subject to the exception for "capable of repetition, yet evading review" because, although the actions are capable of repetition, they were subject to judicial review for approximately one year. *See Huff*, 52 S.W.3d at 184. Thus, the challenged action was not too short in duration to be litigated fully before the action ceased or expired. *See id*.

The interagency contract was signed by Greer on December 16, 2003, and by McBee on December 20. It was declared terminated by McBee and the Commission on January 10, 2005. Thus, the contract was in effect for approximately thirteen months before it was terminated. During that time, Verney had the opportunity to challenge the state agencies' statutory authority to enter into the contract but failed to do so until December 14, 2004, one year after the contract went into effect,

20

and one month before it was terminated. Verney does not allege that the Attorney General or the Commission has ever entered into a similar contract, but argues that the interagency contract was terminated in an attempt to evade judicial review. Based on the record before us, although the interagency contract is capable of repetition, because it was in effect and subject to judicial review for approximately thirteen months, we cannot hold that it is capable of repetition, yet evading review as a matter of law. *See Miranda*, 133 S.W.3d at 226 (whether undisputed evidence of jurisdictional facts establishes a trial court's jurisdiction are questions of law reviewed de novo). Based on the same reasoning, the fact that state employee time was spent on the underlying contracts does not present a justiciable controversy. Accordingly, we hold that Verney's challenge to the interagency contract is moot. We overrule Verney's first and second issues.

**Disposition of the case**

Verney requests that, in the event we disagree with his arguments regarding standing, we reverse the case and remand to permit him the opportunity to conduct discovery and amend his pleadings. If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to amend. *Miranda*, 133 S.W.3d at 227. We hold that the pleadings in this case, for the reasons discussed in this opinion, affirmatively negate the existence of jurisdiction. Thus, Verney is not entitled to a remand to amend his pleadings or to conduct discovery. *See id*.; *see also Tenneco Inc. v. Enterprise Prods. Co.*, 925 S.W.2d 640, 647 (Tex. 1996) (trial judge had all relevant information at hand when he granted summary judgment motion, thus determination to allow parties more time for discovery was within court's discretion).

21

**CONCLUSION**

Having found that the trial court lacked subject-matter jurisdiction, we affirm the trial court's dismissal of the case for want of jurisdiction.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Puryear

Dismissed for Want of Subject-Matter Jurisdiction

Filed:   July 28, 2006

22