TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-05-00064-CV






Russell J. Verney, Appellant


v.


Greg Abbott, Individually and as Attorney General of the State of Texas and

Reagan E. Greer, Individually and as Executive Director of the

Texas Lottery Commission, Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT

NO. GN404078, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N




 This is a case involving a taxpayer's challenge to the expenditure of public funds. 
Appellant Russell Verney sought a declaratory judgment that appellees Greg Abbott, the Attorney
General of the State of Texas (Attorney General) and Reagan Greer, Executive Director of the Texas
Lottery Commission (the Commission), acted outside their authority by entering into certain
contracts related to payment for legal services. Verney also sought injunctive relief enjoining the
payment of pending and future sums due under the contracts. The trial court granted appellees' plea
to the jurisdiction. For the reasons explained below, we will affirm the court's dismissal of
appellant's case for want of jurisdiction.


BACKGROUND



 This case is presented against the backdrop of the Texas legislative process,
specifically the 2003 and 2004 legislative sessions in which the Texas legislature considered
proposed legislation involving video lottery terminals (VLTs) and related Indian gaming issues. 
Therefore, we begin with a brief recitation of gaming law and historical facts.


Overview of Texas gambling law and legislative activity

 There are three elements of a lottery: (1) the offering of a prize, (2) the award of the
prize by chance, and (3) the giving of a consideration for an opportunity to win the prize. Wink v.
Griffith Amusement Co., 100 S.W.2d 695, 701 (Tex. 1936). Lotteries were constitutionally
prohibited in Texas from 1845 until 1991. See Tex. Const. art. III, § 47 (1876) ("The Legislature
shall pass laws prohibiting the establishment of lotteries and gift enterprises in this State, as well as
the sale of tickets in lotteries, gift enterprises or other evasions involving the lottery principle,
established or existing in other States."); Tex. Const. art. XII, § 36 (1869), Tex. Const. art. VII, § 17
(1866), Tex. Const. art. VII, § 17 (1861), Tex. Const. art. VII, § 17 (1845) ("No lottery shall be
authorized by this State; and the buying or selling of lottery tickets within this State is prohibited."). 
Furthermore, the legislature has criminalized certain types of gambling. See Tex. Pen. Code Ann.
§§ 47.001-.10 (West 2003).

 In 1991, however, section 47 of article III of the Texas Constitution was amended to
provide, in relevant part:

(a) The Legislature shall pass laws prohibiting lotteries and gift enterprises in this
State other than those authorized by Subsections (b), (d), (1) and (e) of this section.


. . . .


(e) The Legislature by general law may authorize the State to operate lotteries and
may authorize the State to enter into a contract with one or more legal entities
that will operate lotteries on behalf of the State. 



Tex. Const. art. III, § 47.

 In 1994, two state representatives asked then-Attorney General Dan Morales whether
the legislature "may, by statute, and in the absence of a constitutional amendment, authorize the
operation of slot machines within the State of Texas; or, in the alternative, whether it may authorize
the State to operate slot machines and to contract with one or more entities that will operate the slot
machines on behalf of the State." The Attorney General issued an opinion concluding that slot
machines were not permitted under article III, § 47(e). In relevant part, the opinion stated:


A "slot machine," as that term is commonly understood, is a device which awards
cash or other prizes solely on the basis of chance, and is not affected by any skill,
judgment, or knowledge of a particular player. As such it constitutes an unlawful
lottery in contravention of article III, section 47 of the Texas Constitution. Operation
of "slot machines" may not be authorized by the legislature in the absence of a
constitutional amendment. Furthermore, subsection (e) of article III, section 47, does
not authorize the legislature either to permit operation of slot machines by the state,
or to permit the state to contract with one or more entities to operate slot machines
on behalf of the state. The legislature may not legalize the operation of slot machines
by private entities merely by amending the definition of 'bet' in section 47.01(l) of
the Penal Code.


Op. Tex. Att'y Gen. No. DM-302 (1994). In 2003, a state representative asked Attorney General
Abbott whether the legislature may authorize the State to operate video lottery terminals. See Op.
Tex. Att'y Gen. No. GA-103 (2003). Consistent with the 1994 opinion, Abbott concluded that VLTs
were not permitted under section 47(e). In relevant part, he stated that


in approving the addition of subsection (e) to article III, section 47 of the Texas
Constitution, Texas voters in 1991 did not intend to authorize the state to operate, or
to contract for the operation of, 'lotteries' in the broad sense that it has been
construed by the courts since the adoption of the 1876 constitution. 'Lotteries' under
subsection (a) means any game that contains the elements of prize, chance, and
consideration. In 1991, voters approved a 'state lottery' based on the common
understanding of the term at that time, as evidenced by popular dictionaries and the
ballot proposition presented to Texas voters. Moreover, Attorney General Opinion
DM-302 (1994), issued less than three years after the adoption of article III, section
47(e), is a contemporaneous administrative construction of that amendment which
concludes that voters in 1991 approved a narrow construction of the term "lottery"
that cannot be read to authorize the state to operate slot machines. On the basis of
all these factors, we conclude that article III, section 47(e) of the Texas Constitution
does not permit the legislature to authorize the state to operate video lottery
terminals.



Id. The multifarious issues of what is and is not permitted by the 1991 amendment to section 47 of
article III have yet to be resolved. Rather, they remain the subject of legislative debate and Attorney
General opinions. See, e.g., Op. Tex. Att'y Gen. No. GA-0358 (2005) (asking whether senate bill
1326, which sought to authorize creation of county gaming districts on local option basis to
administer state video lottery and which was proposed but not enacted during regular session of
Seventy-ninth Legislature, would have been effective in absence of constitutional amendment); see
also Tex. S.B. 1326, 79th Leg., R.S. (2005); Tex. H.B. 1, § 8, 78th Leg., 4th C.S. (2004) (introduced
version) (authorizing Lottery Commission to conduct video lottery); Tex. H.B. 2439, 78th Leg., R.S.
(2003) (relating to operation and administration of state lottery, including authorizing Lottery
Commission to offer video lottery); Tex. S.B. 1244, 78th Leg., R.S. (2003) (relating to operation of
video lottery machines at racetracks); Tex. H.R.J. Res. 1, 78th Leg., 4th C.S. (2004) (proposed
resolution to amend article III, section 47 to authorize the state to operate VLTs at racetracks and on
Indian lands); Tex. H.R.J. Res. 3, 78th Leg., 4th C.S. (2004) (proposing constitutional amendment
authorizing state to operate video lotteries); Tex. S.J. Res. 3, 78th Leg., 4th C.S. (2004) (proposing
constitutional amendment authorizing operation of video lottery games in this state); Op. Tex. Att'y
Gen. No. GA-0278 (2004). Ultimately, no legislation regarding VLTs was passed in 2003 or 2004. 
Several bills were also introduced in the 2005 legislative session, but failed to pass. See, e.g., Tex.
H.B. 9, 79th Leg., R.S. (2005); Tex. H.B. 897, 79th Leg., R.S. (2005); Tex. H.B. 2038, 79th Leg.,
R.S. (2005); Tex. S.B. 1097, 79th Leg., R.S. (2005).

 In addition to legislative activity, gambling on Indian reservations has been the
subject of litigation brought and defended by the Attorney General. See Ysleta del Sur Pueblo v.
State of Texas, 36 F.3d 1325, 1327 (5th Cir. 1994); see also State v. Ysleta Del Sur Pueblo, 220 F.
Supp. 2d 668, 698 (W.D. Tex. 2002).


Facts in this case

 On December 16, 2003, First Assistant Attorney General Barry McBee signed two
contracts. The first contract was an "Outside Counsel Contract" between the Attorney General and
Lionel Sawyer & Collins (Lionel Sawyer), a law firm located in Las Vegas, Nevada. The second
contract was an "Interagency Cooperation Contract" between the Attorney General and the
Commission.

 The outside counsel contract recites that "the OAG [Office of the Attorney General] 
requires the assistance of outside legal counsel in carrying out its responsibilities" and provides that
the purpose of the contract is "for the OAG to obtain Outside Counsel to advise and assist the OAG
in the course and scope of the OAG's performance of duties, or provision of services, as described
in Addendum A." Addendum A recites that Lionel Sawyer would provide services including, but
not limited to,


1. Assist[ing] in legal analysis and research of gaming and Indian gaming issues,
contracts, and permitted activities on Indian lands.


2. Assist[ing] in negotiation and preparation of contracts with Indian tribes and
related activities.


3. Legal advice and counsel regarding gaming and Indian gaming and any related
activities.


4. Litigation support services as needed regarding gaming and Indian gaming
issues.



 The second contract, an Interagency Cooperation contract between the Attorney
General and the Commission, includes the following provision: 


STATEMENT OF SERVICES TO BE PERFORMED:



A. The OAG shall provide a full range of legal services relating to legal analysis
and research of gaming and Indian gaming issues, contracts, and permitted
activities on Indian lands, negotiation and preparation of contracts with Indian
tribes and related activities, legal advice and counsel regarding gaming and
Indian gaming and any related activities, litigation support services as needed
regarding gaming and Indian gaming issues to the [Commission], up to the total
dollar amount specified herein.


B. The OAG is authorized to provide any or all of the legal services hereunder by
employing subcontractors or consultants. Notwithstanding the foregoing, the
Attorney General shall obtain consent from the [Commission] prior to
subcontracting legal services under this contract that will be paid for by the
[Commission].


C. The OAG shall consult with the [Commission] on the amount and type of
services to be subcontracted under this contract. The [Commission] shall be
supplied with a copy of all work product produced by OAG subcontracts under
this contract.



Furthermore, the interagency contract details how the Commission will reimburse the Attorney
General. The Attorney General agreed to "provide the [Commission] with detailed billing
information of the actual costs of the subcontracted legal services performed under this agreement"
and limited the amount of reimbursement to $100,000. The interagency contract provided that it
would expire by its terms on August 31, 2005, but either party was permitted to terminate the
contract upon ten days' written notice. On April 27, 2004, the interagency contract was amended
to increase the reimbursement permitted under the contract to $250,000, consistent with the Attorney
General's amended outside counsel contract with Lionel Sawyer.

 On December 14, 2004, over three months after the outside counsel contract expired,
Verney filed suit against Abbott and Greer in their individual and official capacities, as well as
against Carole Keeton Strayhorn, Comptroller of Public Accounts of the State of Texas. (2) Verney
sought both declaratory and injunctive relief. First, he requested a declaration that, because section
556.006 of the government code prohibits a state agency from using appropriated money to attempt
to influence passage or defeat of legislative measure, (1) the interagency cooperation contract and/or
outside counsel contracts are "void as against the laws and/or public policy of the State of Texas or
void as illegal ultra vires activities" of the Commission under the control of Greer and of the OAG
under the control of Abbott, and (2) "that any and all expenditures/disbursements of public funds in
conjunction therewith and/or arising therefrom are thereby deemed unlawful for any and all
purposes." See Tex. Gov't Code Ann. § 556.006(a) (West 2004); Tex. Civ. Prac. & Rem. Code Ann.
§§ 37.001-.011 (West 1997). Verney also requested an injunction permanently enjoining the
Commission and the Attorney General "from any and all future expenditures/disbursements of public
funds pursuant and/or related to" the two contracts, "specifically including any and all expenditures
of public funds in the form of previously 'authorized' payments to the OAG from the Commission
for $176,342.73 as 'reimbursement' for amounts expended to [Lionel Sawyer]; as well as any
authorization for and/or further payments to [Lionel Sawyer] in the now pending amount of
$190,831.17; or any other amounts paid from and/or requiring any expenditures/disbursements of
public funds by the Defendants." (3)

 Strayhorn, through her general counsel, filed an answer notifying the court that she
would abide by the decision of the courts "on all issues presented" and would not disburse any state
funds related to the contracts at issue until a final decision is made in the case. (4)

 The Attorney General and the Commission filed pleas to the jurisdiction. Although
represented by separate counsel, both asserted that Verney lacked standing under the general rules
governing taxpayer lawsuits against governmental entities or the exception to the rule. See Bland
Indep. Sch. Dist. v. Blue, 34 S.W.3d 547, 555-56 (Tex. 2000). They also argued that Verney lacked
standing because performance under the contracts had already been completed. See id. Additionally,
the Commission argued that it does not collect taxes, and its funds are not received through taxes. 
Thus, the taxpayer standing exception does not apply to it in this case. (5) Moreover, the Attorney
General contended that the Uniform Declaratory Judgments Act (UDJA) does not confer jurisdiction
on the trial court, and Verney failed to assert facts that would otherwise confer jurisdiction on the
trial court. See Beacon Nat'l Ins. Co. v. Montemayor, 86 S.W.3d 260, 266 (Tex. App.--Austin
2002, no pet.) (citing State v. Morales, 869 S.W.2d 941, 947 (Tex. 1991), and Texas Ass'n of Bus.
v. Texas Air Control Bd., 852 S.W.2d 440, 446 (Tex. 1993)).

 On January 10, 2005, approximately one month after Verney filed suit, the Attorney
General terminated the interagency contract with the Commission. In an affidavit attached to the
Attorney General's plea to the jurisdiction, McBee averred that he had exercised the option to
terminate the contract and that "[n]o payments were ever made by the [Commission] to the Attorney
General under this agreement and the termination notice provides that no payments are either owed
or will be made in the future." (6) In a supplement to its plea, the Attorney General provided a
responsive letter, dated January 10, from the Deputy General Counsel of the Commission in which
he acknowledged the Attorney General's termination of the contract and stated that based on the
Attorney General's representation that the Commission did not owe the Attorney General any further
payments under the contract, the Commission considered the contract "terminated as of today."

 The trial court granted appellees' pleas to the jurisdiction, denied relief not granted,
and ordered the action dismissed with prejudice. This appeal followed.




DISCUSSION


 In four issues, Verney contends that the trial court erroneously concluded it lacked
subject matter jurisdiction because he had standing as a taxpayer and under the UDJA to pursue his
challenge to the contracts and payments under the contracts. He primarily challenges the Attorney
General's and Commission's ability to defeat the court's jurisdiction by actions taken after suit was
filed.


Standard of review

 A plea to the jurisdiction is a dilatory plea that seeks dismissal of a case for lack of
subject matter jurisdiction. Harris County v. Sykes, 136 S.W.3d 635, 638 (Tex. 2004); Bland, 34
S.W.3d at 554. Whether a court has subject matter jurisdiction is a question of law. Texas Dep't
of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 226 (Tex. 2004); Texas Natural Res. Conservation
Comm'n v. IT-Davy, 74 S.W.3d 849, 855 (Tex. 2002). Whether a party has alleged facts that
affirmatively demonstrate a trial court's subject matter jurisdiction and whether undisputed evidence
of jurisdictional facts establishes a trial court's jurisdiction are questions of law reviewed de novo. 
Miranda, 133 S.W.3d at 226. However, in some cases, disputed evidence of jurisdictional facts that
also implicate the merits of the case may require resolution by the finder of fact. Id. (citing Gates
v. Pitts, 291 S.W. 948, 949 (Tex. Civ. App.--Amarillo 1927, no writ)).

 When a plea to the jurisdiction challenges the pleadings, we determine if the pleader
has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause. Id. (citing
Texas Ass'n of Bus., 852 S.W.2d at 446). We construe the pleadings liberally in favor of the plaintiff
and look to the pleader's intent. Id. If the pleadings do not contain sufficient facts to affirmatively
demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in
jurisdiction, the issue is one of pleading sufficiency, and the plaintiff should be afforded the
opportunity to amend. Id. at 226-27 (citing County of Cameron v. Brown, 80 S.W.3d 549, 555 (Tex.
2002)). If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the
jurisdiction may be granted without allowing the plaintiff an opportunity to amend. Id. at 227.

 If a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider
relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised,
as the trial court is required to do. Id. (citing Bland, 34 S.W.3d at 555). In a case in which the
jurisdictional challenge implicates the merits of the plaintiff's cause of action and the plea to the
jurisdiction includes evidence, the trial court reviews the relevant evidence to determine if a fact
issue exists. Id. If the evidence creates a fact question regarding the jurisdictional issue, then the
trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact
finder. Id. at 227-28. However, if the relevant evidence is undisputed or fails to raise a fact question
on the jurisdictional issue, the trial court may rule on the plea to the jurisdiction as a matter of law. 
Id. at 228.


Taxpayer standing

 The pleas to the jurisdiction were based on Verney's alleged lack of standing to
challenge the contracts and related payments. Standing is a constitutional prerequisite to maintaining
suit. Texas Dep't of Transp. v. City of Sunset Valley, 146 S.W.3d 637, 646 (Tex. 2004) (citing Texas
Ass'n of Bus., 852 S.W.2d at 444. Standing is determined at the time suit is filed in the trial court. 
See Texas Ass'n of Bus., 852 S.W.3d at 446 n.9 (citing Carr v. Alta Verde Indus., Inc., 931 F.2d
1055, 1061 (5th Cir. 1991)); see also Kitty Hawk Aircargo, Inc. v. Chao, 418 F.3d 453, 458 (5th Cir.
2005) (standing determined as of commencement of suit). Except for issues involving mootness,
subsequent events do not deprive the court of subject matter jurisdiction. See Texas Ass'n of Bus.,
852 S.W.3d at 446 n.9.

 As a general rule, unless standing is conferred by statute, a plaintiff must demonstrate
that he possesses an interest in a conflict distinct from that of the general public, such that the
defendant's actions have caused the plaintiff some particular injury. Williams v. Lara, 52 S.W.3d
171, 178-79 (Tex. 2001) (citing Hunt v. Bass, 664 S.W.2d 323, 324 (Tex. 1984)). Taxpayers,
however, fall under a limited judicial exception to this general rule. Williams, 52 S.W.3d at 179-80
(citing Bland, 34 S.W.3d at 556)). Taxpayers in Texas generally have standing to enjoin the illegal
expenditure of public funds and need not demonstrate a particularized injury. Williams, 52 S.W.3d
at 179; Bland, 34 S.W.3d at 556; Calvert v. Hull, 475 S.W.2d 907, 908 (Tex. 1972); Osborne v.
Keith, 177 S.W.2d 198, 200 (Tex. 1944). Implicit in this rule are two requirements: (1) that the
plaintiff is a taxpayer; and (2) that public funds are expended on the allegedly illegal activity. 
Williams, 52 S.W.3d at 179; Bland, 34 S.W.3d at 556; Calvert, 475 S.W.2d at 908; Osborne, 177
S.W.2d at 200. A taxpayer may maintain an action solely to challenge proposed illegal expenditures;
he or she may not sue to recover funds previously expended or challenge expenditures that are
merely "unwise or indiscreet." Williams, 52 S.W.3d at 180 (citing Hoffman v. Davis, 100 S.W.2d
94, 96 (Tex. 1937), and Osborne, 177 S.W.2d at 200). Underpinning these limitations is the
realization that "governments cannot operate if every citizen who concludes that a public official has
abused his discretion is granted the right to come into court and bring such official's public acts
under judicial review." Id. (quoting Osborne, 177 S.W.2d at 200, and citing Bland, 34 S.W.3d at
555). As a component of subject matter jurisdiction, we review a claimant's standing de novo. City
of Sunset Valley, 146 S.W.3d at 646; Texas Ass'n of Bus., 852 S.W.2d at 445.


 Whether Verney had taxpayer standing to challenge the outside counsel contract


 First, we consider whether Verney had standing as a taxpayer to challenge past
payments and to enjoin future payments pursuant to the outside counsel contract. Similarly, we will
consider his standing to challenge the expenditure of public funds in the form of state employee time
related to the contracts.

 The parties dispute whether Bland governs the analysis in this case. See 34 S.W.3d
at 547. In Bland, the school district contracted for the construction of a new high school, financing
$1,050,000, out of the project's total cost of $1,390,000, through a lease-purchase agreement with
Citicorp, Inc. Id. at 549. The contract provided that the district would make semiannual payments
of $53,917 from 1997 through 2011. Id. In 1998, the Blues filed suit to enjoin future payments to
Citicorp, alleging that the lease-purchase agreement was illegal because the district had failed to
comply with certain statutory provisions. Id. The district filed a plea to the jurisdiction, asserting
that the Blues lacked standing because the building had been completed and all that remained from
the transaction was the repayment of the loan. Id. The district also argued that the Blues lacked
standing as district taxpayers because only state funds were used on the project. Id. (Blues did not
assert standing on basis of being state taxpayers). The district court sustained the district's plea in
part, looking only to the agreement and not to collateral evidence. Id. The supreme court held that
in deciding a plea to the jurisdiction, the trial court is not required to look solely to the pleadings but
may consider evidence relevant to the jurisdictional issue, and must do so when it is necessary to
resolve the jurisdictional issues raised. Id. at 555; see Miranda, 133 S.W.3d at 226. Further, the
court concluded that the Blues lacked taxpayer standing to pursue their claim because


the jurisprudential justification for taxpayer suits to enjoin performance of illegal
agreements is that the interferences such suits pose to government activities is slight
in comparison to the protection afforded taxpayers from preventing the culmination
of illegal agreements made by public officials. But the balance in costs and benefits
shifts significantly once the governmental entity has received all that it bargained for
and must simply pay for it. . . . When all that remains is a school district's repayment
of a loan for work completed, allowance of a taxpayer action to prohibit such
repayment threatens a substantial interference with government actions. . . . The
potential for disruption of government operations is too great to allow a taxpayer with
no special injury distinct from the general public's to sue to prohibit the government
from paying for goods and services it has already received and placed in permanent
use.


Bland, 34 S.W.3d at 557-58. (7)

 We conclude that the supreme court's analysis in Bland is dispositive of the taxpayer
standing issues in this case. The outstanding balance owed by the Attorney General to Lionel
Sawyer under the contract is like the loan repayments due in Bland: the Attorney General has
received all that it bargained for in the outside counsel contract because Lionel Sawyer has
completed the legal services contemplated under the contract--the Attorney General "must simply
pay for it." See id. at 558. (8)
 Similarly, the Attorney General has performed under the interagency
contract--the Commission "must simply pay for it." See id. Furthermore, the outside counsel
contract expired pursuant to its own terms before Verney filed suit, and performance and payment
under the interagency contract is directly tied to the outside counsel contract. Thus, the record does
not support a finding that additional services have been contracted for, yet not performed. (9)

 Additionally, a suit to enjoin the performance of a contract becomes moot after the
contract has been fully performed. See Hulett v. West Lamar Rural High Sch. Dist., 232 S.W.2d 669,
670 (Tex. 1950); Labrado v. County of El Paso, 132 S.W.3d 581, 589 (Tex. App.--El Paso 2004,
no pet.). Therefore, even if Verney had standing to challenge the outside counsel contract, when it
expired on its own terms, the issuance of an injunction enjoining performance under the contract
became moot. See id.

 Verney also argues that appellees may not rely on the terms of the contracts because
illegal contracts are void and of no effect. See McGahey v. Ford, 563 S.W.2d 857, 861 (Tex. Civ.
App.--Fort Worth 1969, writ ref'd n.r.e.) (citing J. P. Wooten Motor Co. v. First Bank of Swenson,
281 S.W. 196, 197 (Tex. Comm'n App. 1926, judgm't adopted)) (void instrument has no effect); see
also Florey v. Estate of McConnell, No. 03-04-00318-CV, 2006 Tex. App. LEXIS 4971, at *9 (Tex.
App.--Austin 2006, no pet. h.). Thus, Verney concludes that the jurisdiction of the trial court cannot
be affected by the contract's expiration. We disagree. Even if the contract was illegal and void, a
question we do not decide today, the jurisdiction of the trial court is limited to justiciable
controversies. Thus, we may consider the terms of the contract in determining if the controversy is
justiciable and, therefore, alive or moot. We overrule Verney's third issue.

 In his fourth issue, Verney urges us to hold that, even if the trial court lacked
jurisdiction to determine the legality of the contracts based on his other grounds, it had jurisdiction
to reach the merits of his claims based on his allegation that the expenditure of public funds--in the
form of time spent by state employees related to the underlying acts and in defending the lawsuit he
filed--is also an illegal expenditure of public funds because the underlying acts were ultra vires. 
Verney contends that the supreme court's conclusion in Williams v. Huff supports his theory that the
trial court had jurisdiction to consider his claims because a significant amount of state employee time
has been spent defending this lawsuit. See 52 S.W.3d 171, 183 (Tex. 2001) (concluding that county
funds were expended in operating a religious prison program where there was proof that county-paid
employees "spent a significant amount of the County's time operating" the program). Verney's
reliance on Huff is misplaced.

 Article IV, section 22 of the Texas Constitution provides that the Attorney General
"shall represent the State in all suits and pleas in the Supreme Court of the State in which the State
may be a party . . . and perform such other duties as may be required by law." Tex. Const. art. IV,
§ 22; see El Paso Elec. Co. v. Texas Dep't of Ins., 937 S.W.2d 432, 438 (Tex. 1996). The legislature
has expanded the Attorney General's authority to include representing the State before the appellate
courts. El Paso Elec. Co., 937 S.W.2d at 438 (citing Tex. Gov't Code Ann. § 402.021 (West 2005)). 
The legislature, pursuant to the authority delegated to it under article IV, section 22, may empower
the Attorney General to represent the State in district court. Id. (citing Brady v. Brooks, 89 S.W.
1052, 1055 (Tex. 1905)). The legislature has provided for such representation in particular types of
cases, including this case. See Tex. Gov't Code Ann. § 467.105 (West 2004) (attorney general shall
designate at least one member of attorney general's staff to counsel and advise commission and to
represent commission in legal proceedings). The facts of Huff, 52 S.W.3d at 183, are distinguishable
from this case, in which state employees are utilized within the course and scope of their statutory
and constitutional powers and duties. See Tex. Gov't Code Ann. § 467.105. Accordingly, we hold
that the Attorney General is authorized to spend employee time defending Verney's lawsuit
regardless of the merits of Verney's allegations and that such an expenditure of public funds or
resources does not confer jurisdiction on the trial court. We overrule Verney's fourth issue.


Standing under the UDJA

 Also in his second issue, Verney contends that the trial court erred in finding that he
lacked standing under the UDJA to challenge Abbott's and Greer's actions as ultra vires.

 The UDJA does not extend a trial court's jurisdiction, and a litigant's request for
declaratory relief does not confer jurisdiction on a court or change a suit's underlying nature. 
IT-Davy, 74 S.W.3d at 855 (citing Morales, 869 S.W.2d at 947); see Tex. Civ. Prac. & Rem. Code
Ann. §§ 37.001-.011. Although private parties may seek declaratory relief against state officials who
allegedly act without legal or statutory authority, IT-Davy, 74 S.W.3d at 855 (citing Texas Educ.
Agency v. Leeper, 893 S.W.2d 432 (Tex. 1994), W. D. Haden Co. v. Dodgen, 308 S.W.2d 838, 838
(Tex. 1958)), a declaratory judgment will only declare the rights, duties, or status of the parties in
an otherwise justiciable controversy. Democracy Coalition v. City of Austin, 141 S.W.3d 282, 297
(Tex. App.--Austin 2004, no pet.) (Citing Frasier v. Yanes, 9 S.W.3d 422, 427 (Tex. App.--Austin
1999, no pet.)). Although Verney's suit under the UDJA properly sought declaratory relief related
to his allegation that state officials acted outside their statutory authority, we must consider whether
the trial court properly granted appellees' pleas to the jurisdiction because his claims were moot. 
As we have already discussed, any challenge to the outside counsel contract was moot because the
contract expired on its own terms before Verney filed suit. See Hulett, 232 S.W.2d at 670; Labrado,
132 S.W.3d at 589.


 Mootness

 Dismissal for mootness is not a ruling on the merits. Speer v. Presbyterian
Children's Home & Serv. Agency, 847 S.W.2d 227, 229 (Tex. 1993). A case becomes moot if a
controversy ceases to exist between the parties at any stage of the legal proceedings, including the
appeal. In re Kellogg Brown & Root, Inc., 166 S.W.3d 732, 737 (Tex. 2005); Allstate Ins. Co. v.
Hallman, 159 S.W.3d 640, 642 (Tex. 2005); Board of Adjustment v. Wende, 92 S.W.3d 424, 427
(Tex. 2002); Williams v. Lara, 52 S.W.3d 171, 184 (Tex. 2001). If a case becomes moot, the parties
lose standing to maintain their claims. Huff, 52 S.W.3d at 184 (citing City of Los Angeles v. Lyons,
461 U.S. 95, 105-06 (1983)).

 A suit to enjoin the performance of a contract becomes moot after the contract has
been fully performed. See Hulett, 232 S.W.2d at 670; Labrado, 132 S.W.3d at 589. When a request
for injunctive relief becomes moot because the action sought to be enjoined has been accomplished,
a request for declaratory relief also becomes moot. Speer, 847 S.W.2d at 229; Labrado, 132 S.W.3d
at 589. In some circumstances, however, a live claim for attorney's fees will prevent a suit for
injunctive and declaratory relief from becoming moot. See Camarena v. Texas Employment
Comm'n, 754 S.W.2d 149, 151 (Tex. 1988). We conclude that Verney's challenge to the interagency
contract and payments thereunder became moot when the contract was terminated without any
payment, see Hulett, 232 S.W.2d at 670, and with the express acknowledgment that no payments
would be made in the future.

 Verney contends that if we find that his claims are moot, they fall under the "capable
of repetition, yet evading review" exception to the mootness doctrine. Huff, 52 S.W.3d at 184. We
disagree. This exception applies only in rare circumstances. Id. (citing Lyons, 461 U.S. at 109). In
order to invoke the exception, a plaintiff must prove that: (1) the challenged action was too short in
duration to be litigated fully before the action ceased or expired; and (2) a reasonable expectation
exists that the same complaining party will be subjected to the same action again. Huff, 52 S.W.3d
at 184 (citing Murphy v. Hunt, 455 U.S. 478, 482 (1982)); see Blum v. Lanier, 997 S.W.2d 259, 264
(Tex. 1999); General Land Office v. OXY U.S.A., Inc., 789 S.W.2d 569, 571 (Tex. 1990). We
conclude that Verney's claims are not subject to the exception for "capable of repetition, yet evading
review" because, although the actions are capable of repetition, they were subject to judicial review
for approximately one year. See Huff, 52 S.W.3d at 184. Thus, the challenged action was not too
short in duration to be litigated fully before the action ceased or expired. See id.

 The interagency contract was signed by Greer on December 16, 2003, and by McBee
on December 20. It was declared terminated by McBee and the Commission on January 10, 2005. 
Thus, the contract was in effect for approximately thirteen months before it was terminated. During
that time, Verney had the opportunity to challenge the state agencies' statutory authority to enter into
the contract but failed to do so until December 14, 2004, one year after the contract went into effect,
and one month before it was terminated. Verney does not allege that the Attorney General or the
Commission has ever entered into a similar contract, but argues that the interagency contract was
terminated in an attempt to evade judicial review. Based on the record before us, although the
interagency contract is capable of repetition, because it was in effect and subject to judicial review
for approximately thirteen months, we cannot hold that it is capable of repetition, yet evading review
as a matter of law. See Miranda, 133 S.W.3d at 226 (whether undisputed evidence of jurisdictional
facts establishes a trial court's jurisdiction are questions of law reviewed de novo). Based on the
same reasoning, the fact that state employee time was spent on the underlying contracts does not
present a justiciable controversy. Accordingly, we hold that Verney's challenge to the interagency
contract is moot. We overrule Verney's first and second issues.


Disposition of the case

 Verney requests that, in the event we disagree with his arguments regarding standing,
we reverse the case and remand to permit him the opportunity to conduct discovery and amend his
pleadings. If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the
jurisdiction may be granted without allowing the plaintiff an opportunity to amend. Miranda, 133
S.W.3d at 227. We hold that the pleadings in this case, for the reasons discussed in this opinion,
affirmatively negate the existence of jurisdiction. Thus, Verney is not entitled to a remand to amend
his pleadings or to conduct discovery. See id.; see also Tenneco Inc. v. Enterprise Prods. Co., 925
S.W.2d 640, 647 (Tex. 1996) (trial judge had all relevant information at hand when he granted
summary judgment motion, thus determination to allow parties more time for discovery was within
court's discretion).

CONCLUSION

 Having found that the trial court lacked subject-matter jurisdiction, we affirm the trial
court's dismissal of the case for want of jurisdiction.



__________________________________________

 W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Puryear

Dismissed for Want of Subject-Matter Jurisdiction

Filed: July 28, 2006

1. Authorizing legislature to "authorize and regulate bingo games" and to "permit charitable
raffles" that are conducted by assorted religious, nonprofit, and volunteer organizations." Tex.
Const. art. III, § 47(b), (d).
2. Verney later filed a notice of partial nonsuit, clarifying that his suit against Strayhorn was
only against her in her official capacity because she remained a necessary party.
3. Verney also sought to recover his costs and attorney's fees. See Tex. Civ. Prac. & Rem.
Code Ann. § 37.009 (West 1997).
4. In a letter to this Court, Strayhorn confirmed that her position remains as stated in her
original answer.
5. Because of our disposition of this case, we need not reach this issue.
6. The letter, signed by McBee, was attached to the affidavit, and states: "To date, no
payments have been made pursuant to the contract. The OAG agrees that the Texas Lottery
Commission does not owe the OAG any further payments under the Interagency Cooperation
Contract and that no payments will be made in the future." In his brief, Verney states that he
objected to the affidavit, and the record contains Verney's stated disapproval of any consideration
of the affidavit by the court. However, the record does not contain any ruling on Verney's objection
to the affidavit. The trial court, in refusing to issue findings of fact and conclusions of law, stated
that "[i]n granting the plea, the Court found that the material facts relevant to the jurisdictional issue
were undisputed."
7. In reaching the holding in Bland, the supreme court distinguished the case of Kordus v. City
of Garland, 561 S.W.2d 260 (Tex. Civ. App.--Tyler 1978, writ ref'd n.r.e.). See Bland Indep. Sch.
Dist. v. Blue, 34 S.W.3d 547, 557 (Tex. 2000). Kordus involved a taxpayer suit to recover money
donated and dues paid by the City of Garland to the local chamber of commerce, and to prohibit the
City from performing its agreement with the chamber to donate additional money in the future. See 
561 S.W.2d at 260. In allowing the suit, the Court stated that it was an "important" fact that the
agreement was executory--the chamber had not yet rendered any service for the payments. Bland,
34 S.W.3d at 557 (citing Kordus, 561 S.W.2d at 260). In Bland, however, performance was
complete and nothing remained to be performed under the agreement except payment for services
rendered.
8. Verney also argues that the Attorney General and the Commission did not receive all that
it "bargained for" because "they wanted legalized gambling and ended up with worthless paper"
because no laws were passed as the results of Lionel Sawyer's efforts. We disagree. The Attorney
General contracted for legal services that they apparently received: assistance with legal analysis,
negotiation and preparation of contracts, research, legal advice, and litigation support services. In
any event, the contracts are no longer in effect, and payment remains due only for Lionel Sawyer's
performance under the outside counsel contract.

9. Verney's attempts to distinguish Bland are unavailing. Although he points to distinctions
on the bases that he is challenging the actual subject-matter of the contracts, not merely the method
of payment; that there is no third-party lender involved in this case; and that the threatened
interferrance with government action is lower in this case--these distinctions are irrelevant to
Verney's standing as a taxpayer. The essence of the holding in Bland is directly on point in this case:
when all that remains is payment for work completed, allowance of a taxpayer action to prohibit such
payment threatens a substantial interference with government actions. See id. at 557-58.